UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| N. E. M., et al.,<br><br>            Plaintiffs,<br><br>    v.<br><br>CITY OF SALINAS, et al.,<br><br>            Defendants. | Case No. 5:14-cv-05598-EJD<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 41 |

       Carlos Mejia-Gomez was shot and killed by City of Salinas police officers in 2014. His survivors, N.E.M., Roberto Mejia-Gomez and Elias Mejia-Baires,[1] subsequently filed this civil action against the City and the two officers involved in the incident, Danny Warner and Josh Lynd,[2] for federal and state causes of action, derivatively and on their own behalf.

       Federal jurisdiction arises under 28 U.S.C. § 1331, and presently before the court is Defendants' Motion for Summary Judgment. Dkt. No. 41. Plaintiffs oppose the motion. Having carefully considered the parties' arguments in conjunction with the record which includes two videos of the incident, the court concludes that disputed factual issues preclude entry of summary judgment on all causes of action. Accordingly, Plaintiffs' motion will be granted in part and denied in part for the reasons explained below.

## I.    BACKGROUND

### A.    Facts

       On May 20, 2014, at approximately 12:13 p.m., Juana Lopez called 911 from her home in Salinas and reported a drunk male with scissors was trying to enter her home. Decl. of Bruce D.

---

[1] In this order, "Plaintiffs" refers to N.E.M., Roberto Mejia-Gomez, and the Estate of Elias Mejia-Baires, the latter of which is now a party per separate order filed this same date.

[2] "Defendants" refers to the City and Officers Warner and Lynd, collectively.

Praet, Dkt. No. 41, at Ex. 1. Lopez told the operator the man tried to kill her dog and exposed himself, and had told Lopez to call the police "to come get him." Id. The subject of Lopez's report, later identified as Carlos Mejia-Gomez, eventually put the scissors into a backpack he was carrying and began to walk away from Lopez's residence. Id.

Officers Warner and Lynd responded to the scene at the corner of Elkington and Del Monte, and found Mejia-Gomez "faced away" and looking at Lopez. Warner Depo., at 62:3-4. Lopez made eye contact with the officers and began pointing at Mejia-Gomez, causing Mejia-Gomez to turn in the direction of the officers. Id. at 7-11. Warner reported seeing "huge shears" sticking out of Mejia-Gomez's backpack. Id. at 62:24-63:4.

The officers drew their firearms and, in Spanish and English, commanded Mejia-Gomez to stop and put his hands up. Warner Depo., at 63:5-8; Lynd Depo., at 11-22. Mejia-Gomez did not comply and began walking down Elkington toward Sanborn, "crossing the street from side of Del Monte to the other side," while the officers followed at a distance between four and eight feet, and continued to command him to stop. Warner Depo., at 69:13-22; Lynd Depo., at 38:21-44:17; Praet Decl., at Ex. 6 ("Prieto video"). Officer Lynd told Officer Warner to deploy his taser while Officer Lynd "stayed lethal." Lynd Depo., at 44:18-22. In response, Officer Warner activated his taser and pulled the trigger but it did not deploy. Id. at 69:24-70:18. After Officer Warner told Officer Lynd his taser was not functioning, Officer Lynd told Officer Warner to "switch," meaning that Officer Lynd transitioned to his taser while Officer Warner transitioned to his firearm. Id. at 11-13.

Mejia-Gomez turned to face officers and began walking backwards. Prieto video. By then, Mejia-Gomez had removed the shears from his backpack and was holding them near his head. Id. Officer Lynd discharged his taser toward Mejia-Gomez, but it had no effect. Lynd Depo., at 48:4-11. Mejia-Gomez tripped over a partition and fell onto his back but was still holding the shears. Prieto video; Warner Depo., at 10-13; Lynd Depo., at 57:12-20. Officers Warner and Lynd "closed the distance" to four to eight feet while Mejia-Gomez was on the

ground, but did not apprehend him. Prieto video; Lynd Depo., at 53:10-12.

Mejia-Gomez got up and began walking away from the officers in the same direction as before. Id. Officers Warner and Lynd became concerned Mejia-Gomez would endanger the patrons of a busy bakery he was approaching, and decided he could not be permitted to make it to the next corner. Warner Depo., at 77:7-25; Lynd Depo., at 55:5-25. Mejia-Gomez, still holding the shears, stopped before he reached the corner and turned around toward Officer Lynd, who was attempting a leg sweep. Warner Depo., at 87:4-9; Lynd Depo., at 61:22-62:6. Both officers then discharged their firearms. Warner Depo., at 87:10-11; Lynd Depo., at 62:6. Mejia-Gomez died at the scene. Prieto video. Toxicology tests taken after Mejia-Gomez's death were positive for alcohol and methamphetamine. Praet Decl., at Ex. 8.

### B. The Instant Action

Plaintiffs initiated this case on December 23, 2014. Nine causes of action are asserted in the Complaint, eight of which are brought solely by N.E.M.: (1) violation of § 1983 for wrongful death, (2) violation of § 1983 for survival, (3) violation of § 1983 for Monell liability, (4) wrongful death in violation of California Civil Procedure Code §§ 377.60 and 377.61, (5) violation of California Civil Code § 52.1, (6) violation of California Civil Code § 51.7, (7) intentional infliction of emotional distress, and (8) gross negligence. One cause of action asserting violation of § 1983 for disruption of the right to familial relationship is brought jointly by Plaintiffs.

## II. LEGAL STANDARD

A motion for summary judgment or partial summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. Celotex Corp. v.

1  Catrett, 477 U.S. 317, 323 (1986).  If the issue is one on which the nonmoving party must bear the

2  burden of proof at trial, the moving party need only point out an absence of evidence supporting

3  the claim; it does not need to disprove its opponent's claim.  Id. at 325.

4  If the moving party meets the initial burden, the burden then shifts to the non-moving party

5  to go beyond the pleadings and designate specific materials in the record to show that there is a

6  genuinely disputed fact.  Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 324.  A "genuine issue"

7  for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing

8  the evidence in the light most favorable to that party, could resolve the material issue in his or her

9  favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

10  The court must draw all reasonable inferences in favor of the party against whom summary

11  judgment is sought.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

12  However, the mere suggestion that facts are in controversy, as well as conclusory or speculative

13  testimony in affidavits and moving papers, is not sufficient to defeat summary judgment.  Id.

14  ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than

15  simply show that there is some metaphysical doubt as to the material facts.");  Thornhill Publ'g Co.

16  v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).  Instead, the non-moving party must come

17  forward with admissible evidence to satisfy the burden.  Fed. R. Civ. P. 56(c).

18  "If the nonmoving party fails to produce enough evidence to create a genuine issue of

19  material fact, the moving party wins the motion for summary judgment."  Nissan Fire & Marine

20  Ins. Co. v. Fritz Cos., Inc., 210 F.3d 1099, 1103 (9th Cir. 2000).  "But if the nonmoving party

21  produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats

22  the motion."  Id.

23  **III.  DISCUSSION**

24  **A.  Fourth Amendment Cause of Action**

25  **i.  Objective Reasonableness**

26  Defendants contend they are entitled to summary judgment on the § 1983 causes of action

27

28  Case No.: 5:14-cv-05598-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

under the Fourth Amendment because the undisputed facts show that the force used by Officers Warner and Lynd was objectively reasonable when tested under Fourth Amendment. The court disagrees, however, because there exists on this record triable fact issues on the question of objective reasonableness.

### a. Governing Authority

"Section 1983 imposes liability upon any person who, acting under color of state law, deprives another of a federally protected right." Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 624 (9th Cir. 1988). A § 1983 plaintiff must prove two elements: (1) the defendants acted under color of state law, and (2) the defendants deprived plaintiff of a right secured by the Constitution or federal statutes. Id.

For § 1983's second element, N.E.M's causes of action arise under the Fourth Amendment and its prohibition on unreasonable seizures. See Graham v. Connor, 490 U.S. 386, 394 (1989) ("In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force.") ("Graham"); see also Tennessee v. Garner, 471 U.S. 1, 7 (1985) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.") ("Garner").

"The fourth amendment, applicable to the states through the fourteenth amendment, protects individuals against . . . the use of excessive force." Id. To determine whether the force used by officers was excessive, the court must "assess whether it was objectively reasonable 'in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation.'" Gregory v. Cty. of Maui, 523 F.3d 1103, 1106 (9th Cir. 2008) (quoting Graham, 490 U.S. at 397). This inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396. "[C]areful attention" must be paid to the "facts and circumstances of each particular case," including the following factors: "the severity

of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Id. The most important of these factors is the second one. Mattos v. Agarano, 661 F.3d 433, 441 (9th Cir. 2011) (en banc).

The reasonableness of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and its assessment "must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97. However, because this record includes video recordings of the incident, the court must "view[] the facts in the light depicted by the videotape." Scott v. Harris, 550 U.S. 372, 380-81 (2007).

Since the balancing by which a Fourth Amendment excessive force claim is examined "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom . . . summary judgment or judgment as a matter of law . . . should be granted sparingly." Drummond v. City of Anaheim, 343 F.3d 1052, 1056 (9th Cir. 2003).

### b. Analysis

In this circuit, excessive force claims are analyzed in three steps as articulated in Glenn v. Washington County, 673 F.3d 864, 871 (9th Cir. 2011) ("Glenn"). First, the court must assess "the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" Id. (quoting Espinosa v. City & Cty. of San Francisco, 598 F.3d 528, 537 (9th Cir. 2010)). Second, the court must evaluate the government's interest in the use of force. Id. Third, the court must "'balance the gravity of the intrusion on the individual against the government's need for that intrusion.'" Id. (quoting Miller v. Clark Cty., 340 F.3d 959, 964 (9th Cir. 2003)).

#### 1. Step 1: Severity of the Intrusion

For the first step, it is undisputed Mejia-Gomez's death resulted from the use of deadly

force by Officers Warner and Lynd. The severity of this intrusion on Mejia-Gomez's Fourth Amendment interests was "extreme" and "unmatched." <u>A.K.H. ex rel. Landeros v. City of Tustin</u>, 837 F.3d 1005, 1011 (9th Cir. 2016). Indeed, the "use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'" <u>Id</u>. (quoting <u>Garner</u>, 471 U.S. at 9).

### 2. Step 2: Government Interest

For the second step, the government's interest in the use of force is determined by evaluating the objective reasonableness of the intrusion through its attendant factors. <u>Id</u>. Taking those factors in order, the transcript of Lopez's 911 call reveals the "crimes at issue" were a possible trespass, a possible assault, or a threatened property damage in light of Lopez's statement to the operator that Mejia-Gomez had entered her yard and home, threatened her with garden shears, exposed himself, and attempted to strangle her dog. The record does not show, however, that Officers Warner and Lynd were aware of this much detail when they arrived at the scene since they did not review the 911 call before responding, and did not speak with Lopez prior engaging Mejia-Gomez. Lynd Depo., at 36:17-37:5. Based on their testimony, it appears Officers Warner and Lynd knew from dispatch that Mejia-Gomez had an "edged weapon" with him. Lynd Depo., at 41:19-23.

In any event, it is undisputed that Mejia-Gomez was on the public street and began walking away from Lopez's house when Officers Warner and Lynd responded. Lynd Depo., at 35:11-19; 40:7-12. The aforementioned "edged weapon," which was revealed to be garden shears, had by then been placed in Mejia-Gomez's backpack, which he was holding. Lynd Depo., at 36:4-6. Any crime Mejia-Gomez had committed against Lopez was complete by the time the officers engaged him, and there is no evidence that Mejia-Gomez continued to commit crimes in the officers' presence, other than failing to comply with their commands. Accordingly, a reasonable jury could find that neither Lopez nor her property was still in jeopardy of injury or damage when

United States District Court
Northern District of California

Officers Warner and Lynd came upon the area.

Turning to the most important factor, the evidence supports a finding, when construed in the light most favorable to Plaintiffs, that Mejia-Gomez did not "pose[ ] an immediate threat to the safety of the officers or others." Graham, 490 U.S. at 396. Again, there is no dispute that Mejia-Gomez's encounter with Lopez had already ended when Officers Warner and Lynd arrived, and the Prieto and Bakery videos (Decl. of Melissa Nold, Dkt. No.44, at Ex. 7) demonstrate that though there were several bystanders, no other individuals were near enough to Mejia-Gomez to be immediately threatened as he moved down the sidewalk and away from Lopez's home. Although Officers Warner and Lynd state they were concerned for patrons of a nearby business given its location and the time of day, nothing currently in the record shows or suggests an actual, immediate threat to anyone in particular from an objective perspective. See Deorle v. Rutherford, 272 F.3d 1272, 1281 (9th Cir. 2001) ("[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern.").

Nor does Mejia-Gomez's possession of the garden shears negate a triable issue on whether he posed an immediate threat to Officers Warner and Lynd or others. While deadly force is permissible "if the suspect threatens the officer with a weapon" (Garner, 471 U.S. at 11), or makes "a furtive movement, harrowing gesture, or serious verbal threat (George v. Morris, 736 F.3d 829, 838 (9th Cir. 2013)), the fact that a "'suspect was armed with a deadly weapon' does not render the officers' response per se reasonable under the Fourth Amendment." Id. (quoting Glenn, 673 F.3d at 872-73). Here, the Prieto and Bakery videos show that Mejia-Gomez removed the garden shears from the backpack and was holding the shears above and around his head as he backed away from the officers. The videos also appear to show that Mejia-Gomez was holding one of the shears' handles immediately before he was shot. Other than that evidence - which a jury could interpret as threatening in the way the officers apparently did, or as a non-threatening reaction to being followed by officers at gunpoint - the videos do not overtly show that Mejia-Gomez used

the garden shears to immediately threaten anyone, including Officers Warner and Lynd, though they testified otherwise at their depositions by stating that Mejia-Gomez twice lunged at Officer Lynd with the shears. While the videos do not foreclose the possibility that Mejia-Gomez lunged at some point, they do not objectively support that fact either. Thus, a jury could find that Mejia-Gomez did not lunge, and at this stage the court must adopt that interpretation of the evidence.

Moreover, a reasonable jury could find based on the videos that Mejia-Gomez did not have sufficient control of the garden shears to actually brandish them as a weapon, particularly since he was walking away from the officers during a period of their encounter, tripping and falling onto his back at one point, and that the officers' assessment of fear for their safety was therefore unreasonable. See Deorle, 272 F.3d at 1281.

Furthermore, the fact that Officers Warner and Lynd had adequate time to formulate a plan to shoot Mejia-Gomez if he reached the corner where the business was located could undercut before a jury any testimony from the officers claiming immediacy to the threat posed by Mejia-Gomez.

On the final factor, even if a factfinder could determine that Mejia-Gomez was "actively resisting arrest or attempting to evade arrest by flight" by failing to comply with commands and continuing to walk away from Officers Warner and Lynd, this determination would not render the intrusion constitutional. If Mejia-Gomez was fleeing, a reasonable jury could find based on the Prieto and Bakery videos that he was not doing so quickly enough to justify the use of deadly force at the moment he was shot. The videos also show that Officers Warner and Lynd had little trouble keeping up with Mejia-Gomez by simply walking behind him. And on the issue of whether Mejia-Gomez was evading arrest because he failed to comply with the officers' demands to stop and put his hands up, it is notable that neither officer warned Mejia-Gomez he would be shot if he continued to walk toward the corner despite their plan to shoot if he did so. Given the pace at which the videos show the event was unfolding, a reasonable jury could find that such a warning was practicable under the circumstances. See Gonzalez v. City of Anaheim, 747 F.3d

789, 794 (9th Cir. 2014) (en banc) ("[W]e have recognized that an officer must give a warning before using deadly force 'whenever practicable.'").

Also, "'alternative methods of capturing or subduing a suspect' available to the officers" are relevant to the reasonableness of force. Id. at 794 (quoting Smith v. City of Hemet, 394 F.3d 689, 703 (9th Cir. 2005) (en banc)). There is no dispute that attempts by Officers Warner and Lynd to deploy their tasers were unsuccessful. However, a reasonable jury could find that a taser was not the only non-lethal option available to the officers. The record shows that Officer Lynd had access to a baton and contemplated a "leg sweep," and the evidence supports other possibilities: the officers could have apprehended Mejia-Gomez when he tripped and was on his back, or could have shot him in a manner less likely to cause death. The Prieto and Bakery videos provide a basis upon which a jury could find sufficient time for the officers to utilize one or more of those options, especially when this evidence is coupled with the officers' contemplation of when it would be appropriate to shoot Mejia-Gomez.

### 3. Step 3: Balancing

Considering the totality of circumstances in the light most favorable to Plaintiffs (A.K.H., 837 F.3d at 1011), and balancing "the gravity of the intrusion" against "the government's need for that intrusion" (Garner, 471 U.S. at 8), there is sufficient evidence in the record upon which a reasonable jury could find that Officers Warner and Lynd violated the Fourth Amendment by fatally shooting Mejia-Gomez. As described, the record could support a conclusion that the extreme intrusion on Mejia-Gomez's Fourth Amendment rights substantially outweighed any interest in using deadly force. Consequently, Defendants' argument based on objective reasonableness does not entitle them to summary judgment.

### ii. Qualified Immunity

Defendants also argue for entry of summary judgment in their favor because Officers Warner and Lynd are entitled to qualified immunity.

### a. Governing Authority

"The defense of qualified immunity protects 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Romero v. Kitsap Cty., 931 F.2d 624, 627 (9th Cir. 1991) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). It "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Hunter v. Bryant, 502 U.S. 224, 229 (1991). The doctrine also "balance[s] two important, competing interests: the need to hold public officials accountable for irresponsible actions, and the need to shield them from liability when they make reasonable mistakes." Morales v. Fry, --- F.3d ----, 2017 WL 4582732, at *4 (9th Cir. 2017). "Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not 'clearly established' or the officer could have reasonably believed that his particular conduct was lawful." Romero, 931 F.2d at 627.

Two questions are relevant to an examination of whether qualified immunity shields an officer's conduct. "First, viewing the facts in the light most favorable to the plaintiffs, did [the officers] use excessive force in violation of the Fourth Amendment?" A.K.H., 837 F.3d at 1010. "Second, if [the officers] used excessive force, did [they] violate a clearly established right?" Id. Answering either question in the negative results in immunity to the officer. See White v. Pauly, 137 S. Ct. 548, 551 (2017) ("Qualified immunity attaches when an official's conduct does not violate clearly established statutory *or* constitutional rights of which a reasonable person would have known." (internal quotation marks omitted; emphasis added)) ("White"); see also Hughes v. Kisela, 862 F.3d 775, 783 (9th Cir. 2016) ("[A]t summary judgment, an officer may be denied qualified immunity in a Section 1983 action 'only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, *and* (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation.'"

(emphasis added)).

### b. Analysis

#### 1. Question 1: Excessive Force

On the first question, the court has identified in the preceding discussion the record facts upon which a reasonable jury could find that the use of force by Officers Warner and Lynd was excessive. As such, the analysis of qualified immunity's first question merges with that of objective reasonableness. The court therefore finds, viewing the evidence in the light most favorable to Plaintiffs, that the fatal shooting of Mejia-Gomez violated the Fourth Amendment.

#### 2. Question 2: Clearly Established Rights

On the second question, the court observes that "[f]or a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Maxwell v. Cty. of San Diego, 708 F.3d 1075, 1082 (9th Cir. 2013). Stated differently, "[a] clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Mullenix v. Luna, 136 S. Ct. 305 (2015) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).

In rendering this legal decision (Morales, 2017 WL 4582732, at *3), the court must look to "cases relevant to the situation [the officers] confronted," Brosseau v. Haugen, 543 U.S. 194, 200 (2004) (quotation marks omitted) ("Brosseau"), keeping in mind that a case need not be "directly on point." Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1093 (9th Cir. 2013) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). Existing precedent, however, "must have placed the . . . constitutional question beyond debate." al-Kidd, 563 U.S. at 740. Ultimately, "[t]he dispositive question is 'whether the violative nature of particular conduct is clearly established.'" Mullenix, 136 S. Ct. at 308 (quoting al-Kidd, 563 U.S. at 742). "The plaintiff bears the burden of proof that the right allegedly violated was clearly established[.]" Romero, 931 F.2d at 627.

Moreover, the analysis "is limited to 'the facts that were knowable to the defendant officers' at the time they engaged in the conduct in question." Longoria v. Pinal Cty., --- F.3d ----,

2017 WL 4509042, at *7 (9th Cir. 2017) (quoting <u>Hernandez v. Mesa</u>, 137 S. Ct. 2003, 2008

(2017)). But because this is a determination on summary judgment, any disputed facts - including

those presented by the video evidence - must be construed in the light most favorable to Plaintiffs

to the extent there is room for debate. <u>Id</u>.

In a string of published and unpublished opinions responding to recent Supreme Court

precedent, the Ninth Circuit has clarified the district court's duty when determining whether a

purported violation involves a "clearly established right."[3] To that end, the Ninth Circuit holds

that before qualified immunity can be denied and liability imposed on an officer, the district court

must identify precedent in existence on the date of the incident that put the officer "on clear notice

that using deadly force in [the] particular circumstances would be excessive." <u>S.B. v. Cty. of San

Diego</u>, 864 F.3d 1010, 1015 (9th Cir. 2017) ("<u>S.B.</u>"). "General excessive force principles," such

as those stated in <u>Graham</u> and <u>Garner</u>, are not "'inherently incapable of giving fair and clear

warning to officers,' but they 'do not by themselves create clearly established law outside an

obvious case.'" <u>Id</u>. (quoting <u>White</u>, 137 S.Ct. at 552). Thus, in most situations, the court must

identify a case where an officer acting under similar circumstances was held to have violated the

Fourth Amendment. <u>Id</u>. at 1015-16. But "[i]n the absence of 'a case directly on point,' [the court]

compare[s] 'specific factors' relevant to the excessive force inquiry to determine whether a

reasonable officer would have known that the conduct in question was unlawful." <u>Isayeva v.

Sacramento Sheriff's Dep't</u>, 872 F.3d 938, 947 (9th Cir. 2017) (quoting <u>Bryan v. MacPherson</u>,

630 F.3d 805, 826 (9th Cir. 2010)).

Despite these clear instructions and the emphasis the Supreme Court and the Ninth Circuit

---

[3] In addition to those cases cited or discussed above, the Ninth Circuit has recently discussed or decided qualified immunity with respect to the conduct of law enforcement in the following cases: <u>Bartlett v. Nieves</u>, --- Fed. App'x. ----, 2017 WL 4712440 (9th Cir. 2017); <u>McGuigan v. Cty. of San Bernardino</u>, --- Fed. App'x ----, 2017 WL 4570610 (9th Cir. 2017); <u>Shafer v. Cty. of Santa Barbara</u>, 868 F.3d 1110 (9th Cir. 2017); <u>Estate of Lopez v. Gelhaus</u>, 871 F.3d 998 (9th Cir. 2017); <u>Sharp v. Cty. of Orange</u>, 871 F.3d 901 (9th Cir. 2017); <u>Krueger v. City of Missoula</u>, 685 Fed. App'x 631 (9th Cir. 2017), and <u>Bui v. City & Cty. of San Francisco</u>, --- Fed. App'x ----, 2017 WL 2814388 (9th Cir. 2017).

have placed on identifying similar cases, Plaintiffs' two rounds of briefing on this issue are incomplete and unpersuasive. In the initial opposition, Plaintiffs cited only one case when discussing the "clearly established" question, <u>Long v. City and County of Honolulu</u>, 511 F.3d 901 (2007). <u>Long</u>, however, does not involve officers acting under circumstances similar to those that confronted Officers Warner and Lynd, and Plaintiffs make no effort to analogize its "specific factors." Instead, Plaintiffs cite <u>Long</u> for a basic principle of Fourth Amendment excessive force law: that the use of deadly force is reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others. 511 F.3d at 906. That citation is not enough to meet their burden. The Supreme Court has established that legal statements like the one from <u>Long</u> that merely constitute a formulation of "<u>Garner's</u> 'general' test for excessive force" are not specific enough to constitute clearly established law. <u>Mullenix</u>, 136 S. Ct. at 308-309.

Plaintiffs' supplemental arguments filed after the summary judgment hearing are similarly unconvincing. Dkt. No. 52. They conflate the separate questions that must be answered to determine whether qualified immunity applies by arguing that "[w]hile this Court asked for cases showing the Defendants Lynd and Warner's actions amounted to constitutional violations that were clearly established . . . , Plaintiffs maintain that the presence of material fact questions prevent this determination." That statement is incorrect because the result it assumes does not automatically follow the cause; a dispute of material fact as to whether an officer's conduct constitutes a constitutional violation does not mean that qualified immunity must be denied. <u>See</u> <u>Isayeva</u>, 872 F.3d at 945 (holding the district court erred because "the existence of a genuine dispute about the reasonableness of an officer's use of force does not preclude granting qualified immunity" since the doctrine "involves two questions"). This is because such a dispute in the facts cannot resolve the second question requiring the identification of clearly established law. That is a legal inquiry, examined apart from the factual record, which also must be completed and satisfied. If it is, disputed material facts may then prevent summary judgment in the officer's

United States District Court
Northern District of California

favor. But if it is not, judgment on the basis of qualified immunity should be entered even if the facts are disputed.

In addition, Plaintiffs imply the court should not follow <u>S.B.</u> and excuse the requirement that she produce a similar Fourth Amendment case because "<u>S.B.</u> is an overly expansive interpretation" of the Supreme Court's holding in <u>White</u>. Whether Plaintiff's assessment of <u>S.B.</u> is accurate or not is of no moment; this court is bound to follow <u>S.B.</u>'s holding unless and until it is overruled. <u>In re Zermeno-Gomez</u>, 868 F.3d 1048, 1052 (9th Cir. 2017) (holding that under the "law of the circuit" doctrine, a published decision from the Ninth Circuit is binding and must be followed until "overruled by a body competent to do so"). Thus, any invitation to overlook <u>S.B.</u> or its interpretation of <u>White</u> must be rejected.

In any event, Plaintiff embraces one point from <u>S.B.</u> without actually acknowledging it. The <u>S.B.</u> court recognized that the <u>Graham</u> and <u>Garner</u> legal standards may qualify as clearly established law for cases involving obvious or "run-of-the-mill" Fourth Amendment violations (864 F.3d at 1017), and Plaintiff likewise recognizes this possibility in her supplemental brief through citation of <u>Brosseau</u>, a case in which the Supreme Court noted that <u>Graham</u> and <u>Garner</u> can sufficiently inform officers "in an obvious case . . . even without a body of relevant case law." Applying those portions of <u>S.B.</u> and <u>Brosseau</u> to this case, the court concurs that one general articulation of Fourth Amendment authority is relevant and constitutes clearly established law under these factual circumstances: that is, an officer must give a warning before using deadly force whenever practicable. <u>Gonzalez</u>, 747 F.3d at 794; <u>accord</u> <u>Garner</u>, 471 U.S. at 11-12. That legal declaration, undoubtedly in existence on May 20, 2014, does not require the definition afforded by another case with similar facts in order for officers to understand its mandate and application.[4]

Here, there is no evidence that either Officer Warner or Officer Lynd warned Mejia-Gomez he would be shot before they discharged their firearms, despite the testimony from both

---

[4] In fact, the Ninth Circuit in 1997 described the requirement that officers provide a warning if possible before utilizing deadly force as a clearly established principle. <u>Harris v. Roderick</u>, 126 F.3d 1189, 1201 (9th Cir. 1997), <u>cert. denied</u>, 522 U.S. 1115 (1998).

officers that they gave Mejia-Gomez several other commands.  Nor is there any evidence that either officer communicated to Mejia-Gomez he would face deadly force if he made it to the corner.  Viewing the evidence in the light depicted by the Prieto and Bakery videos, a reasonable jury could conclude that such warnings were practicable under the pace at which the events unfolded.

But that does not end the matter, because the court also finds that two cases cited by Plaintiffs can be considered clearly established law here.  Though not directly on point, these cases have comparable "specific factors" relevant to the use of force engaged against Mejia-Gomez.  See Isayeva, 872 F.3d at 947.

In Glenn, officers were summoned to a home by parents whose 18-year-old son, Lukus, was intoxicated and threatening to kill himself.  When the officers arrived, Lukus was holding a knife to his neck but not threatening anyone else.  The officers screamed commands at Lukus, such as "drop the knife or you're going to die," but Lukus may not have heard or understood the commands because he was intoxicated.  The officers also instructed Lukus' parents and grandmother to return to the residence and close the door, which they all did.  At that point, "the officers could have positioned themselves between Lukus and the front door to the home without having to get any closer to Lukus, but they chose to stand elsewhere."  673 F.3d at 869.  Another officer then arrived and shot Lukus with a beanbag shotgun.  Lukus recoiled in response and began to move away from the beanbag fire toward the alcove between the house and the garage.  Seeing that, the officers "independently determined that if Lukus made a move toward the house with his parents inside, they would use deadly force."  Id.  They then shot Lukus after he took one or two steps, killing him.

The district court granted summary judgment to the officers after finding the use of force did not violate Lukus' Fourth Amendment rights and that the officers were entitled to qualified immunity.  The Ninth Circuit reversed.  Significantly, the Glenn court found summary judgment improper because a jury could find that Lukus did not pose an immediate threat to the safety of

others at the time he was shot.  Indeed, though the evidence showed Lukus did not heed orders to put down the knife, it also showed when viewed in the plaintiff's favor that Lukus had not committed a severe crime, the officers had an unobstructed view of Lukus during the incident and had guns trained on him, Lukus did not attack the officers or threaten to attack them (and the officers could have easily moved if he did), all bystanders had complied with the officers' directions to return to their residence, no one was close enough to Lukus to be harmed by him before officers could intervene, the officers did not warn Lukus they would use lethal force if he continued to walk toward the residence, Lukus was not fleeing or resisting arrest, and the officers did not attempt to employ less lethal alternatives.

Comparing the "specific factors" from Glenn to this record when viewed in Plaintiffs' favor, a reasonable officer would have known that the use of deadly force against Mejia-Gomez was unlawful.  Officers Warner and Lynd testified that Mejia-Gomez, like Lukus, did not respond to commands that he drop the shears.  But also like Lukus, the evidence shows that Mejia-Gomez's crimes were not "severe," that Mejia Gomez did not threaten or attack the officers or anyone else with the shears after the officers arrived at the scene, and that Mejia-Gomez was not in active flight or resisting arrest, particularly since the videos appear to show that one officer could have safely placed himself between Mejia-Gomez and the corner, or between Mejia-Gomez and any business, without also coming in range of the shears.

The surrounding circumstances were also comparable to Glenn; Officers Warner and Lynd had an unobstructed view of Mejia-Gomez with guns drawn the entire time and could have intervened before someone was harmed, though harm to others appears unlikely since the videos show that no one was close enough to Mejia-Gomez to be injured by the shears.  In addition, like the officers in Glenn, neither Officer Warner nor Officer Lynd warned Mejia-Gomez he would be shot if he kept walking to the corner despite their decision to do so, and they did not employ other less lethal alternatives after the failed taser attempt, even though other alternatives were available and contemplated.

A "specific factor" comparison can also be made to <u>Hayes v. County of San Diego</u>, 736 F.3d 1223 (9th Cir. 2013). In <u>Hayes</u>, two officers arrived at a residence in response to a domestic disturbance call. The officers spoke with Hayes' girlfriend, who informed them the couple had been arguing about Hayes' suicide attempt. The officers entered the dimly-lit residence with guns holstered to check on Hayes' welfare. They encountered Hayes standing in an adjacent kitchen area once they entered the living room, and one officer ordered Hayes to show his hands. While taking one or two steps toward the officers, Hayes raised his hands to shoulder level and "revealed a large knife pointed tip down in his right hand." 736 F.3d at 1227-28. One officer drew his gun and fired at Hayes, killing him. The officer later stated he shot Hayes because "he wasn't stopping," but Hayes' girlfriend, who witnessed the shooting, indicated Hayes was not charging the officers. <u>Id</u>. at 1228.

The district court granted summary judgment to the officers, but the Ninth Circuit reversed. Analyzing state law claims under the Fourth Amendment standard for objective reasonableness, the <u>Hayes</u> court held that reasonable jurors, viewing the evidence in the light most favorable to the plaintiff, could conclude the officers' use of deadly force not objectively reasonable. The court noted, inter alia, that there was no evidence Hayes was actively resisting arrest or attempting to evade arrest, that Hayes may have been walking toward the officers but was not charging them, that there was no clear evidence Hayes threatened the officers or others with the knife, and that Hayes was not warned before he was shot.

In light of <u>Hayes</u>, a reasonable officer would have been aware that using deadly force against Mejia Gomez was unlawful. As already noted, a reasonable jury viewing the evidence in Plaintiffs' favor could find that Officers Warner and Lynd used unreasonable deadly force because Mejia-Gomez, like Hayes, was not actively resisting arrest or attempting to evade arrest, was walking away but did not lunge at the officers, did not threaten the officers or others with the shears, and was not warned before he was shot.

In sum, the court finds that it was clearly established on May 20, 2014, that an officer must

give a warning before using deadly force whenever practicable. The court also finds that <u>Glenn</u> and <u>Hayes</u> clearly established for Officers Warner and Lynd whether or not deadly force against Mejia-Gomez was lawful under the circumstances. Consequently, Officers Warner and Lynd are not entitled to qualified immunity at this time because there is a material issue of fact as to whether they violated Mejia-Gomez's clearly established constitutional rights. In turn, Defendants' summary judgment motion must be denied as to Plaintiff's Fourth Amendment excessive force cause of action.

### B. Fourteenth Amendment Cause of Action

Turning to the other federal claim, Defendants move for summary judgment on Plaintiffs' cause of action under the Fourteenth Amendment. "Such a claim requires the plaintiffs to prove that the officers' use of force 'shock[ed] the conscience.'" <u>Gonzalez</u>, 747 F.3d at 797 (quoting <u>Porter v. Osborn</u>, 546 F.3d 1131, 1137 (9th Cir. 2008)). The primary legal question under that standard is whether it can be met by a showing of deliberate indifference, or whether the plaintiff must instead show a purpose to harm for reasons unrelated to legitimate law enforcement objectives. <u>Porter</u>, 546 F.3d at 1137. If the circumstances were such that actual deliberation was practical, liability may attach from an officer's deliberate indifference. <u>Id.</u> at 1138. "Deliberation" for the purposes of the "shocks the conscience" test is not a literal concept and is not necessarily tied to the amount of time allowed for consideration before action. <u>Id.</u> at 1139. In addition, the court may not "parse an officer's intentions and initial decisions to use force" when deciding "the level of culpability to apply under the shocks the conscience test." <u>Id.</u> at 1138.

Placing this case on the spectrum between deliberate indifference and purpose to harm, the court finds the conditions as they presented to Officers Warner and Lynd are more akin to "an evolving set of circumstances that took place over a short time period," to which the "purpose to harm" level of culpability applies, rather than an extended opportunity to do better teamed with a protracted failure even to care, which calls for application of deliberate indifference. <u>Id.</u> at 1139. As captured on the Prieto video, the entire incident occurred in less than two minutes, leaving the

officers little opportunity to reflect on their decision to shoot once it was made. Although a jury could find that the officers' fear for public safety was unwarranted and could also find the use of force was excessive, these possibilities do not alter the urgency the officers perceived from the situation based on their knowledge of the area, even if that perception was mistaken. See Porter, 546 F.3d at 1138.

Plaintiff's arguments to the contrary are unpersuasive. They focus on disputed facts such as whether the officers felt threatened by Mejia-Gomez, note there were no visible bystanders close enough to Mejia-Gomez to be injured, and state that a "reasonable jury could find that the Defendant Officers' conduct of premeditating to a point at which they would shoot" Mejia-Gomez violates the Fourteenth Amendment. But as the Ninth Circuit has explained, such facts "are more relevant to the next step of the analysis," occurring after the applicable level of culpability is determined. Id. at 1140.

Thus, Plaintiffs must demonstrate that Officers Warner and Lynd acted with a purpose to harm Mejia-Gomez that was unrelated to legitimate law enforcement objectives. Plaintiffs have not done so, even when the facts are viewed in their favor. They have not produced any evidence showing that the officers had motives outside of those related to law enforcement. As such, Defendants are entitled to summary judgment on Plaintiffs' cause of action under the Fourteenth Amendment.

### C. Monell Cause of Action

The Supreme Court has held that "a municipality may only be sued under section 1983 if the action that is alleged to be unconstitutional implement [ed] or execute[d] a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers, or the city made a deliberate or conscious choice to fail to train its employees adequately." Boyd v. Benton Cty., 374 F.3d 773, 784 (9th Cir. 2004) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978)); Mackinney v. Nielsen, 69 F.3d 1002, 1010 (9th Cir. 1995)) (internal citations and quotation marks omitted). Defendants move for summary judgment on Plaintiffs' Monell

cause of action against the City on two grounds.

First, Defendants argue the claim cannot proceed because the officers are entitled to qualified immunity. This argument can only prevail if qualified immunity resulted from a finding that no constitutional violation occurred. See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (holding that Monell liability will not attach "based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm"); see also Long, 511 F.3d at 907 ("If no constitutional violation occurred, the municipality cannot be held liable . . . ."). Because a jury must decide whether the officers violated Mejia-Gomez's rights under the Fourth Amendment, this follow-along argument does not succeed in obtaining summary judgment on the Monell cause of action.

Second, Defendants argue Plaintiffs cannot produce sufficient evidence to prove a Monell cause of action. Important to this discussion is the manner in which Plaintiffs frame their claim, because the loose form of argument on this topic raises several potential issues. In response to Defendants' motion claiming a lack of evidence, Plaintiffs state they "do not argue that Defendant City's policy allowing the use of unconstitutional excessive force is the basis" of the claim. Instead, "Plaintiffs maintain that Defendant City's actual policies led to the constitutional harm suffered by Plaintiffs. . . ." Plaintiffs then identify a "grievously vague policy that its police officers were required to maintain their Tasers." They also identify a policy that does not require officers to carry any non-lethal equipment while on duty.

Additionally, Plaintiffs rely on a failure to train or supervise that gives rise to a "policy or custom." More specifically, Plaintiffs state that despite the death of Mejia-Gomez and the recommendation of the manufacturer, the City "did not retrain the Defendant Officers on proper taser use or maintenance."

As the court understands their arguments, Plaintiffs rely both on affirmative policies of the City, as well as on a policy of deliberate indifference. For Monell liability to attach based on the former, "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to

the municipality." <u>Bd. of the Cty. Comm'rs of Bryan Cty. Okla. v. Brown</u>, 520 U.S. 397, 404 (1997). "The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." <u>Id</u>. (emphasis preserved). "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." <u>Id</u>. In other words, the identified policy must be both the "but-for" and proximate cause of the violation. <u>See</u> <u>Van Ort v. Estate of Stanewich</u>, 92 F.3d 831 (9th Cir. 1996); <u>see also</u> <u>Harper v. City of Los Angeles</u>, 533 F.3d 1010, 1026 (9th Cir. 2008).

Similarly, imposition of liability on a local governmental entity for failing to act to preserve constitutional rights, otherwise known as a policy of deliberate indifference, contains a similar "moving force" causation requirement. <u>Oviatt ex rel. Waugh v. Pearce</u>, 954 F.2d 1470, 1474 (9th Cir. 1992) (citing <u>City of Canton v. Harris</u>, 489 U.S. 378, 389-91 (1989)).

Viewing the record in the light most favorable to Plaintiffs, a reasonable jury could not find the City's policies as they identify them, or the lack of any "policy or custom," was the "moving force" behind the violation of Mejia-Gomez's constitutional rights. As to the taser policy, it may have been the "but-for" and proximate cause of Officer Warner's failed attempt to discharge his taser against Mejia-Gomez, as Plaintiffs argue. But that's where the chain of causation ends. The record shows that other intervening events occurred after the failed taser attempt but before the shooting - including another failed taser attempt by Officer Lynd, a failed leg sweep, and a decision by the officers to use deadly force when Mejia-Gomez reached a specific area - such that no direct causal link can be made between the taser policy and the deadly force used against Mejia-Gomez. <u>See</u> <u>Van Ort</u>, 92 F.3d at 837.

A like analysis applies to the policy concerning non-lethal equipment. The evidence shows that Officers Warner and Lynd *were* carrying non-lethal equipment on the date of their interaction with Mejia-Gomez, and there is no evidence in the record upon which a reasonable jury could find the absence of additional non-lethal equipment, or a policy that does not require non-

lethal equipment, was the "moving force" behind the violation.

Finally, Plaintiffs have not produced evidence supporting their theory based on a failure to train or supervise officers concerning proper taser use. Plaintiffs cite to the City's knowledge of Mejia-Gomez's death as well as recommendations from Taser and the Department of Justice issued after the shooting occurred. But this is notice-after-the-fact evidence that does not show that the failure to train reflects a "'deliberate choice to follow a course of action . . . made from among various alternatives' by city policymakers," such that the alleged policy of deliberate indifference was the "moving force" behind the constitutional violation. City of Canton, 489 U.S. at 389 (quoting Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985)). If anything, the evidence on which Plaintiffs rely may show the City was deliberately indifferent by not retraining the officers *after* the violation occurred, but not that such deliberate indifference caused the violation.

In short, a reasonable jury could not find Monell liability even when viewing the evidence in Plaintiffs' favor. Summary judgment will be granted on the Monell cause of action.

**D.    State Law Causes of Action**

Defendants argue the state law causes of action are derivative of the Fourth Amendment excessive force claim, and must stand or fall along with it. Because the Fourth Amendment cause of action survives this motion, so do those asserted under state law.

**IV.    ORDER**

Based on the foregoing, Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

The motion is GRANTED as to the Fourteenth Amendment and Monell causes of action, but is otherwise DENIED.

**IT IS SO ORDERED.**

Dated:  November 6, 2017

EDWARD J. DAVILA
United States District Judge